United States Courts
Southern District of Texas
FILED

January 18, 2022

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| **v** | § | |
| | § | |
| **LAMONT RATCLIFF** | § | **CRIMINAL NO. H-19-450-S3** |
| **RICHARD PLEZIA** | § | |
| | § | |
| **DEFENDANTS** | § | |

## THIRD SUPERSEDING INDICTMENT

### INTRODUCTION

At all times material to this indictment:

1.      Personal injury law is an area of legal specialization.   Personal injury cases are civil lawsuits brought by plaintiffs seeking compensation for harm caused by a defendant's actions.   Once a plaintiff establishes liability of a defendant, through either trial or settlement, the defendant, or commonly the defendant's insurance carrier, must pay the plaintiff for the injuries caused by the defendant's actions.   The cost of a plaintiff's injuries often includes the plaintiff's medical bills.   Normally, the defendant or the insurance carrier pays the plaintiff's attorney who then distributes the funds from a trust account (the "IOLTA account") to, among others, the plaintiff, the medical providers, and himself and other attorneys for the legal fee.   Personal injury cases involving automobile accidents are potentially more lucrative if the accident involved a commercial vehicle (a "commercial case")

1

rather than a personal vehicle because of differences in insurance coverage.

2.     Barratry, commonly known as "ambulance chasing," is the practice of illegally soliciting clients who may be in need of a lawyer.   Generally, attorneys in Texas may not personally solicit employment with potential clients who have not invited the contact.   *See* Texas Penal Code § 38.12(a)(2); Texas Disciplinary Rule of Professional Conduct 7.03(a).   In Texas, barratry is both a crime and a violation of the ethics rules that govern the practice of law.   Attorneys in Texas have been prosecuted for barratry, and the State Bar of Texas, the organization that issues and administers the rules governing the conduct of attorneys licensed to practice law in Texas, seeks to prevent barratry through attorney disciplinary actions, education, and outreach.

3.     Attorneys who commit barratry often do so indirectly by paying a "case runner."   A "case runner" or "runner" is a non-attorney who collects an illegal fee (a kickback) for referring clients to attorneys.   Under Texas law, it is illegal to pay non-attorneys, such as case runners, for client referrals.   *See* Texas Penal Code § 38.12(a)(4).   Such payments also violate the ethics rules of the State Bar of Texas. *See* Texas Disciplinary Rule of Professional Conduct 7.03(b).   Under the ethics rules, attorneys are also not permitted to split their fees with non-attorneys.   *See* Texas Disciplinary Rule of Professional Conduct 5.04(a).   Under limited circumstances, an attorney may split a fee with a referring attorney.   *See* Texas Disciplinary Rule of Professional Conduct 1.04(f).

4.     The Internal Revenue Service ("IRS") is an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States.   Under these laws, individuals and corporations are required to accurately report income and deductions to the IRS on annual income tax returns in order for the IRS to carry out its lawful function to ascertain income; compute, assess and collect income taxes; and audit tax returns and records.   Commonly used IRS forms include the following:

- Form 1040: individual tax return;

- Form 1120 or 1120S: corporate tax return;

- Form 656: application for an Offer in Compromise, an agreement between the taxpayer and the IRS that settles the taxpayer's tax liabilities for less than the full amount owed;

- Form 1099: form disclosing Miscellaneous Income that is required to be sent to the IRS and the payee for payments above a certain amount made for contract labor;

- Form 4549: form containing Income Tax Examination Changes, which lists the IRS's proposed changes to a tax return as a result of an IRS civil audit, including any penalties.

5.     The federal tax code allows businesses to claim a tax deduction for "ordinary and necessary" expenses incurred in conducting the business.   However,

no deduction is allowed for kickbacks or other payments that are illegal under state law if that state law is generally enforced.   *See* 26 U.S.C. § 162(c).   Under the tax code, "a kickback includes a payment in consideration of the referral of a client, patient, or customer."   *Id*.   Illegal kickbacks made in a barratry scheme in violation of Texas law are not deductible business expenses.

6.      Financial institutions, including banks, are required to file a Currency Transaction Report ("CTR") with the federal government for cash transactions made by their clients above $10,000.

7.      Jeffrey Stern ("Stern"), who has been previously charged, was an attorney in Houston, Texas who practiced personal injury law.   Stern's law firm was known at various times as Stern, Miller & Higdon, Jeffrey M. Stern, Attorney at Law, or the Stern Law Group.

8.      Frederick Morris ("Morris"), who has been previously charged, was a case runner in Houston.

9.      Defendant LAMONT RATCLIFF ("RATCLIFF") was a case runner and clinic owner in Houston.

10.      Marcus Esquivel ("Esquivel"), who has been charged separately, was a case runner in Houston.   Esquivel operated as Le Reve Advertising Consultants d/b/a American Risk Management Consultants, Belmark International Inc., Injurylawyerforme.com, Horizon Advertising, Resource Medical Consultant, and American Business Risk Management.

4

11.     Deborah Bradley ("Bradley"), who has been previously charged and is now deceased, was an attorney in Houston who worked for the Stern law firm and practiced personal injury law.

12.     Defendant RICHARD PLEZIA ("PLEZIA") was an attorney in Houston who practiced personal injury law.

13.     Company 1 was a healthcare clinic in Houston that provided treatment for accident victims and was owned and operated by Morris' wife.

14.     Company 2 was a healthcare clinic in Houston that provided treatment for accident victims.   RATCLIFF controlled and was the majority owner of Company 2.

15.     Attorney 1 was an attorney in Houston who practiced personal injury law.

16.     Attorney 2 was an attorney in Houston who practiced criminal law.

17.     Attorney 3 was an attorney in Houston who practiced criminal law.

### COUNT ONE
### (Conspiracy to Defraud the United States - 18 U.S.C. § 371)

**A.     INTRODUCTION**

18.     The Grand Jury adopts, realleges, and incorporates herein the Introduction section of the Indictment as if set out fully herein.

B.     **THE CONSPIRACY AND ITS OBJECTS**

19.     From in or about 2006, and continuing through on or about August 6, 2019, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants,

**LAMONT RATCLIFF**, and
**RICHARD PLEZIA**,

did unlawfully, voluntarily, intentionally, and knowingly combine, conspire, confederate and agree together, with each other and with Jeffrey Stern, Frederick Morris, Deborah Bradley and others known and unknown to the Grand Jury, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment and collection of revenue, to wit, individual and corporate income taxes.

C.     **PURPOSE OF THE CONSPIRACY**

20.     Stern and his coconspirators sought to enrich themselves by illegally recruiting clients through the payment and receipt of illegal kickbacks in order to generate personal injury cases and legal fees.   They worked to conceal and disguise the illegal kickback payments from the IRS, and to hide their resulting income from the IRS, by filing false documents with the IRS, including tax returns, Forms 1099, and an Offer in Compromise, that falsely reported material information, including

amounts of income, expenses, and tax due and owing.

**D.     MANNER AND MEANS OF THE CONSPIRACY**

It was a part of the conspiracy that:

### The Scheme

21.     For over ten years, Stern and his coconspirators have engaged in a criminal scheme to evade taxes and, in the process, hide the fact that they obtain their personal injury cases through barratry by paying illegal kickbacks to case runners.

22.     As part of the scheme, Stern hid business income from his tax preparer and the IRS by depositing business income to personal accounts and by cashing business checks with check cashers and not transferring those funds to his business account.   Stern only reported to his tax preparer and the IRS the income that was deposited into his business account.

23.     In addition, Stern took improper deductions on his tax returns for his illegal kickback payments to case runners.   Both hiding income and taking illegal deductions resulted in the filing of false tax documents that under-reported to the IRS tax that was due.

### Kickbacks Disguised as Referral Fees

24.     Stern paid kickbacks to runners Morris, RATCLIFF, Esquivel, healthcare clinic owners, and others in exchange for referrals of personal injury cases to Stern's law firm.   Typically, the kickback was a flat fee paid up-front, with a

7

larger fee paid on commercial cases.   In addition, Stern shared a percentage of his attorney's fee with some runners after the case settled.

25.     Beginning in approximately 2006, Stern sought to disguise his illegal kickback payments to runners as legitimate referral fee payments to attorneys. Stern told Morris that if Morris wanted to continue to receive kickbacks, Morris would have to come up with the name of an attorney in whose name Stern could issue checks.   In that way, Stern could hide the payments to Morris as seemingly legitimate referral fees paid to an attorney, and Stern could thereby deduct the illegal kickbacks on his tax returns as supposedly legitimate business expenses.

26.     Morris suggested they use Attorney 1.   Stern began paying kickbacks to Morris by writing checks payable in the name of Attorney 1, who agreed to allow Stern and Morris to use his name as the payee on the checks.

27.     Later, Stern also started issuing checks in the names of Attorney 2 and Attorney 3 in order to pay kickbacks to Morris and others.   Unlike Attorney 1, Attorney 2 and Attorney 3 knew nothing of the scheme and had not consented to their names being used in order to pay illegal kickbacks.

28.     Morris took the checks from Stern that were made payable in the names of the three attorneys to check cashers where Morris cashed the checks, usually with forged endorsements.   Morris kept a portion of the cash for himself and paid the rest to his sources who had referred cases to him for Stern, which Morris often did by leaving envelopes of cash with the check cashers for his sources to pick up.

29.    Morris caused his illegally obtained funds to be deposited into bank accounts in a manner that was designed to avoid triggering bank CTR reporting requirements by making multiple cash deposits on the same or consecutive days at different bank branches in Houston below the $10,000 threshold.

30.    In 2008, 2009, and 2010, Stern issued no Forms 1099 to Attorney 1, Attorney 2, or Attorney 3 for the checks made out in their names, which would have notified Attorney 2 and Attorney 3 of the scheme and would have notified the IRS that all three attorneys had allegedly received income from Stern and potentially owed taxes on that income.

### Scheme Modified in Response to IRS Civil Audits

31.    Beginning in 2010, the IRS conducted a series of civil audits of Stern. On approximately May 17, 2010, the IRS notified Stern that he was being audited. Also in 2010, the IRS notified Stern's representative that Stern was hiding income in personal accounts and was failing to issue Forms 1099.   In response, Stern paid penalties to forestall further IRS civil inquiry of his tax avoidance scheme, and he modified the scheme to work around the audit findings and further conceal it from the IRS.

32.    The IRS assessed a civil fraud penalty on Stern for hiding business income in personal accounts.   Stern agreed to and paid the fraud penalty.   For a time, Stern stopped hiding income from the IRS, but later resumed.

33.    The IRS assessed employment taxes for Stern failing to issue Forms

9

1099.   Stern paid the taxes and ceased writing checks payable to Attorney 2 and Attorney 3, to whom he could not issue Forms 1099 since they were not aware of the scheme.   Instead, Stern increased the number of checks he issued payable to Attorney 1, and he filed false Forms 1099 that falsely reported to the IRS that Stern had paid Attorney 1 for services.   In fact, Morris and others had received most of the funds.

34.   As a result of issuing false Forms 1099 to the IRS indicating payment to Attorney 1, Stern and Morris caused false tax returns to be prepared and filed for Attorney 1 that reported as income to Attorney 1 the illegal kickbacks Stern had paid to Morris and others.   These returns also reported false expenses.   Stern and Morris agreed to pay Attorney 1's falsely inflated taxes.   Ultimately, to try to resolve Attorney 1's mounting tax debt, Stern and Morris caused a false Offer in Comprise to be prepared and filed with the IRS that continued to claim Attorney 1 owed taxes on the inflated income falsely reported in his prior returns.

35.   At various times during the conspiracy, Stern provided funds to Attorney 1 to pay for his falsely inflated taxes.   Occasionally, Stern issued checks to Attorney 1 that Attorney 1 deposited into his account.   More often, Stern issued checks in the name of Attorney 1 or in another name, which Morris cashed at a check casher.   Morris would then deliver the cash to Attorney 1.

**Scheme Diversified**

36.     After the civil audits, Stern diversified the ways he paid kickbacks to his runners that would both satisfy the Form 1099 filing requirement and generate false deductible business expenses for Stern.

37.     In 2011 and at other times, Stern issued checks payable to Company 1, Morris' wife's company, with a corresponding Form 1099, allegedly for healthcare services.   In reality, those payments were illegal kickbacks to Morris and others. Morris cashed the checks at a check casher, paid a portion of the cash to himself, and paid the rest to his sources who had referred him cases for Stern.   Stern caused a false 2011 tax return to be filed with the IRS that falsely deducted those checks to Company 1 as legitimate "healthcare expenses," when in reality they were illegal, non-deductible kickbacks.   Similarly, Morris caused a false 2011 tax return to be filed for Company 1 that falsely reported the illegal kickbacks he received from STERN as legitimate income to Company 1, and offset that income with false expenses.

38.     Stern also hid payments to Morris by issuing checks in the name of Stern law firm clients.   In June of 2017, the IRS served a notice of lien on Stern, indicating any checks written by Stern to Attorney 1 would be subject to levy by the IRS in order to pay Attorney 1's overdue tax liability.   While the lien was in place and at other times, Stern paid Morris and others kickbacks by writing checks in the name of Stern clients, which Morris would cash at a check casher and use the funds

to pay kickbacks owed to himself and others.   Once Stern confirmed the lien was removed, he resumed paying kickbacks to Morris and others by issuing checks in the name of Attorney 1 that Morris would cash.

### Kickback Payments Funneled to RATCLIFF

39.    In 2010, after learning of the IRS civil audits, Stern began funneling kickbacks to a second case runner, defendant LAMONT RATCLIFF, through an intermediary attorney, Deborah Bradley.   Stern issued checks payable to attorney Bradley with corresponding Forms 1099; Bradley deposited the checks; and, often on the same day and in the same amount, issued checks to RATCLIFF's company, Company 2.   Bradley issued a Form 1099 at the end of each year reflecting her payments to Company 2.   On his tax returns, Stern caused the kickback payments to be falsely classified as referral fees to an attorney and falsely deducted as business expenses.   Bradley falsely reported the payments from Stern as income on her tax returns with corresponding false deductions for contract labor expenses.

40.    RATCLIFF failed to pay taxes on a portion of the kickbacks from Stern, kickbacks from other attorneys, and other income Company 2 received.   From approximately 2010 through 2014, RATCLIFF cashed checks representing Company 2 business income at check cashers and caused the income on Company 2's tax returns to be under-reported.

### Kickback Payments Funneled to Esquivel

41.    After learning of the IRS civil audits in 2010, Stern altered his method of paying kickbacks to a third runner, Marcus Esquivel.   Before 2010, Stern paid illegal kickbacks to Esquivel in cash, and then later disguised his kickbacks to Esquivel as checks written for alleged payments for advertising, which he made to Esquivel's various business entities.

42.    In 2010 during the audits, Esquivel and Stern suspended their barratry scheme.   Esquivel began referring cases to defendant attorney RICHARD PLEZIA instead of Stern.   PLEZIA, like Stern, paid Esquivel illegal kickbacks for case referrals.   PLEZIA caused the filing of false tax returns that falsely reported the kickbacks as legitimate advertising expenses, which he falsely deducted as business expenses.

43.    In 2011, Esquivel and Stern resumed their illegal kickback arrangement in a modified form.   Because of the IRS civil audits, Stern now paid Esquivel through an intermediary attorney.   Stern and Esquivel funneled the kickback payments through attorney PLEZIA.   From approximately 2011 through 2013, Stern issued checks payable to PLEZIA's law firm with corresponding Forms 1099; PLEZIA deposited the checks to his business bank account; and, often on the same day and in the same amount, PLEZIA issued checks to one of Esquivel's companies. Stern caused false tax returns to be filed in which he falsely deducted those payments as referral fees to an attorney, when in reality they were illegal kickbacks to

Esquivel.

## Obstruction and Cover-Up

44.     On December 1, 2015, a federal grand jury began investigating and seeking evidence regarding Stern's activities.   Once Stern learned of the federal grand jury investigation in 2016, he tried to obstruct the investigation and took steps to conceal the scheme.   Stern ordered coconspirators to destroy subpoenaed documents.   At meetings with coconspirators, he directed them not to cooperate in the investigation.   He also caused additional false tax documents to be filed with the IRS on behalf of Attorney 1.   He continued to make payments to the IRS on both Attorney 1's inflated and legitimate tax debt, in an attempt to keep the scheme from unraveling and being exposed to the IRS.

## E.    ACTS IN FURTHERANCE OF THE CONSPIRACY

45.     In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following acts, among others, were committed in the Southern District of Texas and elsewhere.

## Kickbacks— Stern /Attorneys 1, 2, 3/Morris

46.     In or about 2006, Stern issued checks in the name of Attorney 1 in order to pay Morris and others illegal kickbacks for case referrals.

47.     By at least December 31, 2008, Stern issued checks in the name of Attorney 2 in order to pay Morris and others illegal kickbacks for case referrals.

48.     By at least December 22, 2009, Stern issued checks in the name of

14

Attorney 3 in order to pay Morris and others illegal kickbacks for case referrals.

49.     During 2009, Stern issued checks payable to Attorney 1 totaling approximately $7,500 in order to pay Morris and others illegal kickbacks for case referrals.

50.     During 2009, Stern issued checks payable to Attorney 2 totaling approximately $1,044,310 in order to pay Morris and others illegal kickbacks for case referrals.

51.     During 2009, Stern issued checks payable to Attorney 3 totaling approximately $19,800 in order to pay Morris and others illegal kickbacks for case referrals.

52.     During 2010, Stern issued checks payable to Attorney 1 totaling approximately $483,485 in order to pay Morris and others illegal kickbacks for case referrals.

53.     During 2010, Stern issued checks payable to Attorney 2 totaling approximately $378,240 in order to pay Morris and others illegal kickbacks for case referrals.

54.     During 2010, Stern issued checks payable to Attorney 3 totaling approximately $215,550 in order to pay Morris and others illegal kickbacks for case referrals.

## Civil Audit Payments

55.    On or about June 14, 2011, Stern signed IRS Form 4549, Income Tax Examination Changes, and consented to assessment and collection of $1,111,937.72 by the IRS that included back taxes and interest and a fraud penalty of $341,348.25 for his conduct of intentionally underreporting business receipts by depositing the amounts in his personal bank account.

56.    On or about June 14, 2012, Stern agreed to pay withholding tax of $49,866.82 for his misconduct of failing to issue Forms 1099 for tax year 2008. Stern agreed to pay additional withholding tax for his failure to issue Forms 1099 for tax years 2009 and 2010, which prevented the employment tax audit from being expanded to those tax years.

## Stern/Morris Kickback Scheme Modified in Response to Audits

57.    On or about May 27, 2010, shortly after having learned of the IRS civil audits on May 17, 2010, Stern caused the last alleged referral fee check to issue in the name of Attorney 3.

58.    On or about December 16, 2010, Stern issued the last alleged referral fee check in the name of Attorney 2.

59.    In or about 2012, Stern called a meeting with Morris and Attorney 1. Stern proposed that Attorney 1 falsely claim as income on Attorney 1's tax returns the supposed referral fees that had allegedly been paid to all three attorneys, but in reality had been paid as kickbacks to Morris and others.

60.     Stern caused a false Form 1099 to be filed for $456,771 in alleged referral fee payments made to Attorney 1 in 2011, which was received by the IRS on or before June 8, 2012.

61.     Stern caused a false Form 1099 to be filed for $613,654 in alleged referral fee payments made to Attorney 1 in 2012, which was received by the IRS on or before June 6, 2013.

62.     Stern caused a false Form 1099 to be filed for $1,539,451 in alleged referral fee payments made to Attorney 1 in 2013, which was received by the IRS on or before July 3, 2014.

63.     On or about November 5, 2014, Stern issued a check to Attorney 1 for $50,000 in partial payment of Attorney 1's falsely reported taxes due.

64.     On or about November 7, 2014, Stern issued a check to Attorney 1 for $35,000 in partial payment of Attorney 1's falsely reported taxes due.

65.     On or about November 10, 2014, Stern and Morris caused Attorney 1 to file a false 2009 Form 1040 tax return with the IRS that falsely reported income, which was earned by Morris and others, as income to Attorney 1, and reported false expenses.

66.     On or about November 10, 2014, Stern and Morris caused Attorney 1 to file a false 2010 Form 1040 tax return with the IRS that falsely reported income, which was earned by Morris and others, as income to Attorney 1, and reported false expenses.

67.    On or about November 10, 2014, Attorney 1 made a $15,000 payment to the IRS for taxes due, based on the false tax returns.

68.    On or about November 10, 2014, Attorney 1 made a $50,000 payment to the IRS for taxes due, based on the false tax returns.

69.    On or about November 10, 2014, Attorney 1 made two separate $10,000 payments to the IRS for taxes due, based on the false tax returns.

70.    Stern caused a false Form 1099 to be filed for $1,607,896 in alleged referral fee payments made to Attorney 1 in 2014, which was received by the IRS on or before June 12, 2015.

71.    Stern caused a false Form 1099 to be filed for $1,494,133 in alleged referral fee payments made to Attorney 1 in 2015, which was received by the IRS on or before June 16, 2016.

72.    On or about February 24, 2015, Stern issued a check to Attorney 1 for $20,125 in partial payment of Attorney 1's falsely reported taxes due.

73.    On or about February 26, 2015, Stern issued a check to Attorney 1 for $25,000 in partial payment of Attorney 1's falsely reported taxes due.

74.    On or about February 26, 2015, Attorney 1 purchased a cashier's check for $50,000 that was used to pay the IRS on or about March 2, 2015 for taxes due, based on the false tax returns.

75.    From approximately 2006 to 2019, Stern maintained a ledger that tracked the illegal kickbacks he owed on certain cases.  Stern provided to copy of

this ledger to Morris.

76.    From in or about 2006 through in or about 2019, Morris delivered to Stern written requests for kickback checks that listed the kickbacks Stern owed to Morris and others by case name and case number.

77.    In or about 2016, when Stern was out of town, Morris delivered in person, and sent by text message, requests for kickback checks to Stern's office manager.  The requests listed the kickbacks Stern owed by case name and case number.

78.    In or about 2016, in response to requests from Morris for kickback checks, Stern's office manager confirmed with Stern that the requested checks should issue.

79.    In or about 2016, Morris texted Stern's office manager photos of accident scenes, accident victims, and wrecked cars related to clients Morris was recruiting for the Stern law firm.

80.    On or about April 28, 2016, Morris texted Stern's office manager a written request for a kickback check for $15,500 in order to pay kickbacks in six different Stern law firm cases that Morris listed by case name and number.

81.    On or about April 28, 2016, Stern caused a kickback check to issue in the name of Attorney 1 for $15,500, which Morris cashed at a check casher.

82.    On or about May 25, 2016, Morris texted Stern's office manager a photo of a handwritten request for a kickback check for $12,500 made out to

Attorney 1 in order to pay kickbacks in five different Stern law firm cases that Morris listed by case name and number.

83.     On or about May 25, 2016, Stern caused a kickback check to issue in the name of Attorney 1 for $12,500, which Morris cashed at a check casher.

84.     On or about November 4, 2016, Stern and Morris caused Attorney 1 to file a false 2011 Form 1040 tax return that falsely reported income, which was earned by Morris and others, as income to Attorney 1, and reported false expenses.

85.     On or about November 7, 2016, Stern and Morris caused Attorney 1 to file a false 2012 Form 1040 tax return that falsely reported income, which was earned by Morris and others, as income to Attorney 1, and reported false expenses.

86.     On or about November 11, 2016, Stern and Morris caused Attorney 1 to file a false 2013 Form 1040 tax return that falsely reported income, which was earned by Morris and others, as income to Attorney 1, and reported false expenses.

87.     On or about November 11, 2016, Stern and Morris caused Attorney 1 to file a false 2014 Form 1040 tax return that falsely reported income, which was earned by Morris and others, as income to Attorney 1 and reported false expenses.

88.     On or about November 11, 2016, Stern and Morris caused Attorney 1 to file a false 2015 Form 1040 tax return that falsely reported income, which was earned by Morris and others, as income to Attorney 1, and reported false expenses.

89.     On or about December 1, 2016, Stern issued a check to Attorney 1 for $50,000 in partial payment of Attorney 1's falsely reported taxes due, which

Attorney 1 deposited.

90.     On or about December 1, 2016, Stern issued a check to Attorney 1 for $10,000 in partial payment of Attorney 1's falsely reported taxes due, which Attorney 1 deposited.

91.     On or about December 5, 2016, Attorney 1 made a $60,000 payment to the IRS for taxes due, based on the false tax returns.

92.     On or about March 15, 2017, Stern issued a check to Attorney 1 for $84,542.67 in partial payment of Attorney 1's falsely reported taxes due, which Attorney 1 deposited.

93.     On or about May 11, 2017, Attorney 1 made a $75,000 payment to the IRS for taxes due, based on the false tax returns.

94.     In or about June of 2017, Stern, Morris, and Attorney 1 met and agreed to file a false Offer in Compromise with the IRS to try to resolve Attorney 1's falsely reported tax debt.

95.     Stern caused a false Form 1099 to be filed for $1,351,636 in alleged referral fee payments made to Attorney 1 in 2016, which was received by the IRS on or before June 1, 2017.

96.     On or about June 7, 2017, Stern issued a check to Attorney 1 for $60,000 for partial payment of the Offer in Compromise, which Attorney 1 deposited on June 9, 2017.

97.     On or about June 9, 2017, Attorney 1 wrote a $54,000 check to the IRS

for partial payment of the Offer in Compromise, a copy of which was provided to a tax preparer, but was not sent to the IRS, which in the meantime had levied Attorney 1's account for the funds.

98.     On or about June 9, 2017, Stern and Morris caused Attorney 1 to sign the Offer in Compromise with the IRS that reported Attorney 1 owed the taxes falsely reported in his prior returns.

99.     On or about June 17, 2017, the IRS served a notice of lien on Stern in an effort to collect the outstanding taxes due that were falsely reported by Attorney 1's tax returns.   As a result, to pay illegal kickbacks, Stern temporarily ceased issuing checks in the name of Attorney 1 and instead issued checks in the names of Stern law firm clients, which Morris cashed at a check casher.

100.    After Stern confirmed the lien had been removed, he resumed paying Morris and others kickbacks by issuing checks in the name of Attorney 1, which Morris cashed at a check casher.

101.    On or about June 30, 2017, in order to make a down payment on the Offer in Compromise, Stern signed a check for $54,000 payable to Frost Bank and used the proceeds of that check to purchase a cashier's check for $54,000 made payable to the IRS with the notation, "Re: [Attorney 1]."

102.    On or about June 30, 2017, in order to pay the filing fee of the Offer in Compromise, Stern purchased a cashier's check for $184.00 made payable to the IRS with the notation, "Re: [Attorney 1]."

103.   On or about June 30, 2017, both cashier's checks were redeposited to the same Stern account from which the $54,000 was withdrawn, with the endorsement, "Not used for purpose intended."

104.   On or about June 30, 2017, to make a partial payment on the Offer in Compromise, Stern caused a check to issue in the name of a Stern law firm client for $60,000, which was cashed at a check casher.

105.   On or about July 7, 2017, Attorney 1 sent the Offer in Compromise to the IRS.

106.   On or about July 7, 2017, Attorney 1 made a $54,000 payment to the IRS in partial payment of the Offer in Compromise.

107.   Stern caused a false Form 1099 to be filed for $977,443 in alleged referral fee payments made to Attorney 1 in 2017, which was received by the IRS on or before July 19, 2018.

108.   On or about August 3, 2018, in a recorded meeting, Attorney 1 provided Morris a purported demand letter that Attorney 1 had received from the IRS.   The letter demanded payment of $248,102.66 that Attorney 1 allegedly owed under the Offer in Compromise.   Morris stated, "We're going to pay this, [Attorney 1].   We going to pay this.   I told you."   When Attorney 1 asked whether Stern would help pay, Morris stated "he going to kind of help me a little bit, you know what I'm trying to say, but mostly I'm going to be covering this right here."   Morris added that Stern had paid him approximately $1 million dollars in 2017.   Morris told Attorney 1,

23

"because of what you done, everything you helped me, I'm not coming to you not asking you for one dime. . . . As soon as I get back, I'm going to - - I'm going to rap with Stern Monday or Tuesday and we're going to work on this and we're going to start working on getting this shit off of you."

109.   On or about August 16, 2018, Morris provided Attorney 1 a copy of a false 2017 Form 1040 tax return for Attorney 1 that Stern and Morris had caused to be prepared.

110.   On or about August 17, 2018, in a recorded call, Attorney 1 stated, "I might need to put on something with you and Stern.  This might - - this might be the last - - the last year we do, you know, Stern uses me to pay you, man.  You know, because this stuff is just getting to be too much a headache, man."  Morris replied, "Yeah, yeah."  Attorney 1 stated, "You need to talk to him [Stern] about that, and see if you all can come up with another way."  Morris replied in part, "I will bring that up to him."

111.   On or about August 23, 2018, in a recorded call with Attorney 1, Morris confirmed that he filed Attorney 1's 2017 tax return, stating, "Yeah, it's all done. It's a done deal.  Yeah, we looking good.  They're going to be writing you a letter. As soon as you get that letter, you bring it to me, and then . . . they're going to start the - - that Offer in Compromise."  Discussing payment of the taxes Attorney 1 owed, Morris stated, "And then I already talked with Stern.  I just told him I'm about to come down with about $50,000 or something like that, but, you know, we

24

ready."   Attorney 1 asked, "So you think Stern is going to come through this time?" Morris responded, "Yeah."

112.   On or about August 24, 2018, Stern and Morris caused a false 2017 Form 1040 tax return to be filed with the IRS on behalf of Attorney 1 that falsely reported income, which was earned by Morris and others, as income to Attorney 1, and reported false expenses.

113.   On or about November 2, 2018, in a recorded meeting, Attorney 1 provided Morris with a purported demand letter from the IRS requiring payment of Attorney 1's 2017 taxes due and owing in the amount of $19,188.07.   Morris made a copy of the letter, and drove directly to Stern's office.

114.   On or about November 6, 2018, to pay Attorney 1's falsely reported taxes owed for 2017, Stern issued a check for $30,000 payable to Attorney 1, which Morris cashed at the check casher on November 8, 2018.

115.   Later that same day, on November 8, 2018, in a recorded meeting between Morris and Attorney 1 at Chase Bank in Houston, Morris provided Attorney 1 with $20,000 in cash, which Attorney 1 used to buy a cashier's check for $19,483.07 made payable to the U.S. Treasury, which was received by the IRS on November 15, 2018.

116.   Stern caused a false Form 1099 to be filed with the IRS that reported $1,099,666 in alleged payments made to Attorney 1 in 2018, which was received by the IRS on or before April 22, 2019.

25

### Kickbacks—Stern/Company 1/Morris

117.   From on or about July 7, 2011, until on or about November 17, 2011, Stern issued a series of checks totaling $308,450, among others, to Company 1 in payment of illegal kickbacks to Morris and others for case referrals.   Morris cashed the checks at a check casher and kept a portion of the funds as his kickbacks earned and paid a portion of the money to his sources who had referred cases to him for STERN.

118.   In or about 2011, Stern caused the $308,450 in checks to Company 1 that were in reality kickbacks to Morris to be classified as a business expense, specifically, "Office Expense" in his business books and records.

119.   In 2012, after meeting with his accountant who questioned the clearly incorrect classification, Stern changed the business's books and records to report the $308,450 in checks as "Medical Expense," still a deductible expense for the business.

120.   Stern caused a false Form 1099 to issue to Company 1 that included the $308,450 in checks to Company 1, which was received by the IRS on or before June 8, 2012.

121.   On or about September 21, 2012, Morris caused his wife to file a false 2011 Form 1120S tax return for Company 1 that falsely reported the $308,450 in checks from Stern as income to Company 1 and that offset that false income by reporting false expenses of $265,677, labeled as "outside services."

## Kickbacks—Stern/PLEZIA/Esquivel

122. Beginning in at least 2006, Stern paid Esquivel illegal kickbacks for case referrals in cash.

123. In or about 2007, Stern paid illegal kickbacks to Esquivel for case referrals by issuing checks payable to Esquivel's business entities.

124. In or about 2009, to pay Esquivel illegal kickbacks, Stern issued checks payable to American Business Risk Management, totaling approximately $31,564.95.

125. In or about 2009, to pay Esquivel illegal kickbacks, Stern issued checks payable to Belmark International, totaling approximately $40,000.

126. In or about 2009, to pay Esquivel illegal kickbacks, Stern issued checks payable to Horizon Advertising, totaling approximately $49,781.

127. In or about 2009, to pay Esquivel illegal kickbacks, Stern issued checks payable to LaReve Advertising, totaling approximately $38,500.

128. On or about May 6, 2009, to pay Esquivel illegal kickbacks, Stern issued checks payable to Resource Medical Consultant for approximately $20,000.

129. On or about April 28, 2010, to pay Esquivel illegal kickbacks, Stern issued checks payable to American Business Risk Management for $9,800.

130. In or about May of 2010, Esquivel temporarily stopped his barratry scheme with Stern and instead began referring cases to PLEZIA in exchange for illegal kickbacks.

131.   From in or about 2010 to in or about 2013, Esquivel maintained ledgers that tracked the illegal kickbacks owed to him by Stern, PLEZIA, and others, for specific case referrals.

132.   In or about 2011, Esquivel resumed the illegal kickback arrangement with Stern; however, Stern and Esquivel agreed that the kickbacks to Esquivel would now be concealed by funneling the payments through PLEZIA's account.

133.   In or about 2011, PLEZIA funneled through his account approximately $201,000 in illegal kickbacks from Stern to Esquivel.

134.   On or about September 10, 2012, PLEZIA caused a false 2011 Form 1120S tax return to be filed with the IRS that falsely reported the illegal kickbacks he had paid to Esquivel for case running as deductible business expenses in the form of alleged advertising expenses.

135.   In or about 2012, PLEZIA funneled through his account approximately $163,000 in kickbacks from Stern to Esquivel.

136.   In or about 2013, Stern paid Esquivel kickbacks through PLEZIA's account and provided Esquivel with a loan, which together totaled approximately $143,000.

### Kickbacks—Stern/Bradley/RATCLIFF

137.   In or about 2012, Bradley funneled through her account approximately $128,060 in illegal kickbacks from Stern to RATCLIFF.

138.   In or about 2012, RATCLIFF negotiated at a check casher checks

payable to Company 2 from Bradley and others.

139.   In or about 2013, Bradley funneled through her account approximately $102,505 in kickbacks from Stern to RATCLIFF.

140.   In or about 2013, RATCLIFF negotiated at a check casher checks payable to Company 2 from Bradley and others.

141.   On or about August 26, 2013, RATCLIFF caused a false 2012 Form 1120 tax return for Company 2 to be filed with the IRS that under-reported income to Company 2.

142.   In or about 2014, Bradley funneled through her account approximately $72,990 in kickbacks from Stern to RATCLIFF.

143.   In or about 2014, RATCLIFF negotiated at a check casher checks payable to Company 2 from Bradley and others.

144.   On or about June 23, 2014, RATCLIFF caused a false 2013 Form 1120 tax return for Company 2 to be filed with the IRS that under-reported income to Company 2.

145.   On or about November 3, 2014, Bradley caused a false 2012 Form 1040 tax return to be filed with the IRS that falsely reported the kickbacks from Stern to RATCLIFF as income to her and offset that income with false expenses for "contract labor."

146.   On or about November 3, 2014, Bradley caused a false 2013 Form 1040 tax return to be filed with the IRS that falsely reported the kickbacks from

Stern to RATCLIFF as income to her and offset that income with false expenses for "contract labor."

147.   On or about February 11, 2015, Bradley caused a false 2014 Form 1040 tax return to be filed with the IRS that falsely reported the kickbacks from Stern to RATCLIFF as income to her and offset that income with false expenses for "contract labor."

148.   On or about June 17, 2015, RATCLIFF caused a false 2014 Form 1120 tax return for Company 2 to be filed with the IRS that under-reported income to Company 2.

149.   In or about 2015, Bradley funneled through her account approximately $26,400 in kickbacks from Stern to RATCLIFF.

150.   On or about March 10, 2016, Bradley caused a false 2015 Form 1040 tax return to be filed with the IRS that falsely reported the kickbacks from Stern to RATCLIFF as income to her and offset that income with false expenses for "contract labor."

## Hiding Income

151.   In or about 2007, Stern deposited approximately $873,700 in business income to personal accounts and failed to report that income to the IRS in his tax return.

152.   In or about 2008, Stern deposited approximately $326,487 in business income to personal accounts and failed to report that income to the IRS in his tax

return.

153.   In or about 2009, Stern negotiated at check cashers approximately $200,213 in checks to the Stern law firm and failed to report that income to the IRS in his tax return.

154.   In or about 2010, Stern negotiated at check cashers approximately $24,294 in checks to the Stern law firm and failed to report that income to the IRS in his tax return.

155.   On or about May 6, 2013, Stern negotiated at a check casher a check for $26,585 in attorney's fees received from a collection agency and failed to report that income to the IRS in his tax return.

### Stern Form 1040 Tax Returns

156.   On or about October 12, 2012, Stern caused a false 2011 Form 1040 tax return to be filed with the IRS that falsely reported as expenses kickback payments, which he falsely disguised as "referral fees" and "medical expenses."

157.   On or about June 27, 2013, Stern caused a false 2012 Form 1040 tax return to be filed with the IRS that falsely reported kickback payments and a personal loan as "referral fee expenses" and an alleged "advertising expense" of $30,000.

158.   On or about August 14, 2014, Stern caused a false 2013 Form 1040 tax return to be filed with the IRS that falsely reported kickback payments and a personal loan as "referral fee expenses," and failed to report business checks that were cashed

at a check casher.

159.   On or about October 14, 2015, Stern caused a false 2014 Form 1040 tax return to be filed with the IRS that falsely reported kickback payments as "referral fee expenses."

160.   On or about July 19, 2016, Stern caused a false 2015 Form 1040 tax return to be filed with the IRS that falsely reported kickback payments as "referral fee expenses."

### Obstruction and Concealment

161.   In or about 2016, after learning of the federal grand jury investigation, Stern instructed Morris not to cooperate in the investigation.   In addition, Stern told Morris that, in order to communicate with Stern, Morris was to obtain a prepaid cell phone not registered in Morris' name and to regularly replace the phone and erase any text conversations with Stern.   Morris did so, but on occasion continued to use his personal cell phone to communicate with individuals at the Stern law firm.

162.   In or about 2016, after learning of the federal grand jury investigation but prior to Esquivel receiving a grand jury subpoena, Stern called Esquivel and asked Esquivel to meet him outside of Stern's office.   During the meeting, Stern noted that federal agents had been questioning members of Stern's staff about Esquivel, and Stern asked Esquivel if agents had contacted him.   Esquivel

confirmed that they had not.   Stern asked Esquivel to destroy any records Esquivel had related to their business transactions involving the kickback scheme.

163.   In or about October of 2016, shortly after agents served a federal grand jury subpoena on Esquivel, Esquivel called Stern and informed him that most of the records sought by the subpoena involved Stern.   Stern ordered Esquivel to destroy all records, paper or computer, reflecting Esquivel's referral of clients to Stern and the kickback scheme.   As ordered, Esquivel burned his records, but he retained an electronic copy of some of his kickback ledgers.

164.   In or about November of 2016, Esquivel met with Stern about the federal grand jury subpoena.   Stern confirmed that Esquivel had destroyed his kickback and business documents.   Esquivel told Stern that he would not cooperate in the investigation, and Stern promised to take care of Esquivel's family if Esquivel were convicted.

165.   In or about August of 2017, Stern ordered a meeting with Attorney 1 and Morris at Stern's office.   At the meeting, Stern collected Attorney 1's and Morris' cell phones, and, once the phones were removed from the room, demanded to know whether Attorney 1 was cooperating with law enforcement.   When Attorney 1 denied cooperating, Stern promised to give more money to Attorney 1, to pay Attorney 1's falsely inflated tax liability.

166.   In or about September of 2017, Stern offered Attorney 1 concert tickets and football tickets.

167.   In or about 2017, in a conversation with Morris, Stern discussed the federal criminal investigation and told Morris to shred records of Morris' dealings with Stern.   Morris assured Stern that he would, but Morris retained some of his records.

168.   On or about January 29, 2019, Stern ordered Morris to come to Stern's office immediately.   When Morris arrived, Stern took possession of Morris' cell phone, and, once the phone was removed from the room, demanded to know if Morris had been speaking to federal agents and the substance of the conversation.

169.   In or about July of 2019, Stern instructed Morris to come up with a false explanation for the checks Stern had issued in the names of Attorney 1, Attorney 2, and Attorney 3.   Stern also instructed Morris to try to find compromising information on Attorney 1 that they could use against Attorney 1 if he were to cooperate in the investigation.

In violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FOUR
### (Willfully Filing False Tax Return –
### 26 U.S.C. § 7206(1))

170.  The Grand Jury adopts, realleges, and incorporates herein the Introduction section of the Indictment, the Manner and Means section of Count One, and paragraphs 55, 56, 137-150, 157-160 of the Acts in Furtherance of the Conspiracy section of Count One as if set out fully herein.

171.  On or about the dates shown below, in the Houston Division of the Southern District of Texas and elsewhere,

### LAMONT RATCLIFF,

Defendant herein, did willfully make and subscribe U.S. Corporation Income Tax Returns, IRS Form 1120, and related Schedules, for the following calendar years set forth below and filed with the Internal Revenue Service on or about the dates indicated below, which returns contained and were verified by a written declaration that they were made under the penalties of perjury, and which Defendant did not believe to be true and correct as to every material matter in that Defendant: (a) reported that Gross receipts or sales, on Line 1a of Form 1120, was the amount indicated below, whereas, as he then and there knew and believed, the amount of Gross receipts or sales, on Line 1a of Form 1120, was substantially more; (b)

reported that Taxable income, on Line 30 of Form 1120, was the amount indicated below, whereas, as he then and there knew and believed, the amount of Taxable income, on Line 30 of Form 1120, was substantially more; and, (c) reported that Total tax, on Line 31 of Form 1120, was the amount indicated below, whereas, as he then and there knew and believed, the amount of Total tax, on Line 31 of Form 1120, was substantially more:

| Count | Calendar Year | Approximate Date of Filing | Gross receipts or sales, reported on Form 1120, Line 1a | Taxable income, reported on Form 1120, Line 30 | Total tax, reported on Form 1120, Line 31 |
|---|---|---|---|---|---|
| 2 | 2012 | Aug. 26, 2013 | $717,801 | $13,690 | $2,054 |
| 3 | 2013 | June 23, 2014 | $954,769 | $7,925 | $1,189 |
| 4 | 2014 | June 17, 2015 | $1,004,035 | $29,295 | $4,394 |

In violation of Title 26, United States Code, Section 7206(1).

### COUNT FIVE
### (False Statement –
### 18 U.S.C. § 1001(a)(2))

172. The Grand Jury adopts, realleges, and incorporates herein the Introduction section of the Indictment, paragraph 42 of the Manner and Means section of Count One, and paragraphs 130 and 131 of the Acts in Furtherance of the Conspiracy section of Count One as if set out fully herein.

173. On or about December 7, 2016, in the Southern District of Texas, defendant,

36

**RICHARD PLEZIA,**

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating to Internal Revenue Service—Criminal Investigation Special Agents during an interview in Houston, Texas that he had never paid Marcus Esquivel for a specific case referral.   The statement and representation was false because, as RICHARD PLEZIA then and there knew, he had on multiple occasions paid Marcus Esquivel through Esquivel's companies for referral of specific personal injury cases.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT SIX
### (False Statement –
### 18 U.S.C. § 1001(a)(2))

174.   The Grand Jury adopts, realleges, and incorporates herein the Introduction section of the Indictment, paragraphs 41-43 of the Manner and Means section of Count One, and paragraphs 122-136 of the Acts in Furtherance of the Conspiracy section of Count One as if set out fully herein.

175.   On or about September 28, 2018, in the Southern District of Texas, defendant,

**RICHARD PLEZIA,**

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating to Internal Revenue Service—Criminal Investigation Special Agents during an interview in Houston, Texas that PLEZIA had a deal with Jeffrey Stern and Marcus Esquivel, through Esquivel's company Bel Mark International (Bel Mark), in which Stern would pay up-front expenses related to developing a tort case involving a benzene release at a British Petroleum (BP) refinery near Houston, Texas (the BP benzene case), in return for Stern receiving a percentage of any eventual settlement obtained by the case. PLEZIA further stated that a series of payments made from his account to Bel Mark were payments to Bel Mark for expenses incurred on the BP benzene case.   PLEZIA further stated that a corresponding series of deposits to PLEZIA's account from the Stern law firm were funds PLEZIA received for payment to Bel Mark for its expenses on the BP benzene case.   These statements and representations were false because, as RICHARD PLEZIA then and there knew, he had no agreement with Stern and Esquivel for Stern to help finance Bel Mark's work on the BP benzene case, and for Stern to do so by funneling payments to Bel Mark through PLEZIA's account.   Furthermore, as RICHARD PLEZIA then and there knew, the payments

from Stern through his account to Bel Mark were not related to the BP benzene case.

In violation of Title 18, United States Code, Section 1001(a)(2).

**COUNT SEVEN**
**(Falsification of Records –**
**18 U.S.C. § 1519)**

176.   The Grand Jury adopts, realleges, and incorporates herein the Introduction section of the Indictment, paragraphs 41-43 of the Manner and Means section of Count One, and paragraphs 122-136 of the Acts in Furtherance of the Conspiracy section of Count One as if set out fully herein.

177.   On or about September 28, 2018, in the Southern District of Texas, defendant,

**RICHARD PLEZIA,**

did knowingly falsify a document, specifically a purported August 24, 2010, proposal letter from PLEZIA to Jeffrey Stern related to a fee splitting and cost sharing arrangement on the BP benzene cases, with the intent to impede, obstruct, and influence the investigation and proper administration of a federal criminal investigation, a matter that the defendant knew and contemplated was within the jurisdiction of the Internal Revenue Service—Criminal Investigation, an agency of the United States.

In violation of Title 18, United States Code, Section 1519.

A TRUE BILL:

Original Signature on file
FOREPERSON OF THE GRAND JURY

JENNIFER B. LOWERY
UNITED STATES ATTORNEY

By:

Robert S. Johnson
Assistant United States Attorney

40